**CAL DIVE INTERNATIONAL, INC.
and Cal Dive International
N.V., Plaintiffs,**

v.

**M/V TZIMIN (ex STENA SEAHORSE),
Her Engines, Tackle, Appurtences, Etc.
in rem, et al., Defendants.**

**Civ. A. No. 85–1382–B–C.**

United States District Court,
S.D. Alabama, S.D.

July 20, 1990.

* Honorable John R. Brown, Senior United States Circuit Judge for the Fifth Circuit, sitting by

See also 127 F.R.D. 213.

Alex F. Lankford, III and Clay Rankin, Mobile, Ala., for plaintiffs.

Rae M. Crowe, Ray Morgan Thompson, Mobile, Ala., and James H. Roussel, New Orleans, La., for defendants.

OPINION ON CAL DIVE'S MOTION FOR RECONSIDERATION AND STAY PENDING MANDAMUS TO ELEVENTH CIRCUIT AND CAL DIVE'S SUPERSEDEAS BOND, AMOUNT TO BE RETAINED IN AND RELEASE OF FUNDS FROM REGISTRY

JOHN R. BROWN, United States Circuit Judge *:

The Court at the hearing June 13–14,

designation.

1990 fixed the amounts [1] later reduced to two separate orders for taxable costs of the District Court and probable costs on the appeal, the amount of the supersedeas bond to be filed by Cal Dive,[2] the appellant, the amount to be retained in the Registry of the Court and the amount of funds to be released to Stena, the appellee.[3]

### The Purpose of This Opinion

This opinion is filed to more formally state the Court's reasons for its determinations (note 1).

### How It All Happened

Briefly, Cal Dive filed a libel (complaint) *in rem* against the M/V STENA SEAHORSE to assert a maritime lien for services rendered and funds advanced for performance by the M/V STENA SEAHORSE of diving and related services on Mexican government-owned oil wells in the Bay of Campeche under contracts with Mexican agencies and private companies. After seizure the Stena interest did not seek release under stipulation to abide decree (bond) since at that stage it was a preferred ship mortgagee, not the owner. Cal Dive successfully moved for the interlocutory sale of the vessel under Supplementary Rules for Admiralty and Maritime Claim Rule E(9)(b). The vessel was sold by the Marshal for the cash sum $3,250,000.00 paid by Stena's subsidiary. The Registry funds were thereafter deposited in interest bearing accounts so that, as of July 2, 1990 the Registry funds total $3,879,301.58.

1.

| | | | |
|---|---|---|---|
| (a) | Taxable costs District Court | $126,523.32 | |
| (b) | Estimated Taxable Cost of Stena on Appeal | $100,000.00 | |
| (c) | Interest and Earnings on Registry Funds Withheld ($2,000,000) | $480,000.00 | |
| (d) | Amount of Cal Dive Supersedeas (as agreed by parties July 3, 1990) | | $706,523.32 |
| (e) | Amount to be Retained in Registry | $2,000,000.00 | |

The Court after a three week hearing with numerous witnesses, depositions and over 700 extensive exhibits, announced from the bench its 100 page findings of fact and conclusions of law rejecting Cal Dive claim and entering judgment for Stena.

### (a) Taxable Costs District Court

At the June 13–14 hearing the items in controversy were tabulated (*see* Appendix A and C to the Court's order on taxing costs on which argument, pro and con, was heard, item-by-item and on which the Court extensively stated its reasoning item-by-item and the amount taxed (*see* Order, Appendix B). The hearing and rulings were stenographically reported, the report of which is filed herein and to which full reference is made.

On taxable District Court costs and the estimated amount of Stena's probable Court costs on appeal to be taxed in Stena's favor against Cal Dive nothing need be added except to emphasize that these amounts represent court costs (district and appellate) recoverable by Stena on the assumption that Cal Dive does not prevail in its appeal, and that Stena wins.[4]

### General, Fixing (d) Amount of Cal Dive's Supersedeas (e) Amount to be Retained in the Registory and (f) Amount to be Released to Stena

■ Before discussing each separately the Court points out that these are inevita-

| | | |
|---|---|---|
| (f) | Amount Registry Funds to be released to Stena | $1,879,301.58 |

2. As used throughout this includes Cal Dive International and Cal Dive International N.V.

3. As used throughout this includes Stena Rederi AB and Rederi AB Concordia.

4. Although considerable in total amount such cost are of relative unimportance on any mandamus proceeding as the Court of Appeals will likely not undertake on such preemptory proceeding to give consideration to any of them but will defer action on any items to final disposition on appeal.

bly linked together so the Court's purpose is to outline the respective interests to be protected as to each, Cal Dive and Stena.

### Court Costs

Stena has prevailed in the District Court. As to costs the law necessarily assumes Cal Dive will not prevail. Stena is entitled to all costs as taxed, the collection of which is interrupted by Cal Dive's appeal. If Stena prevails, because of the interruption by the appeal, it has to have security for the ultimate collection of these taxed costs and for all costs incurred and allowed by the Court of Appeals.

### Supersedeas Bond

The supersedeas bond is to protect a single party—Stena, the District Court winner. The problem is: what does it take to protect Stena under the law's assumption that Stena wins, Cal Dive loses, on the appeal? Initially this will consist of Court costs, district and appellant taxable in Stena's favor (*see* n. 1(a) and (b)). In addition, however, since by the Court's final decree (December 27, 1989) Stena is entitled to the use of all funds in the Registry but Cal Dive's appeal interrupts that realization, Stena is entitled at least to the interest funds to be retained in the Registry (n. 1(e)) pending appeal and such further sums as would compensate Stena for the loss of the use (earnings) on the Registry funds as to be withheld (*see* n. 1(e)).

### Registry Fund

### Amount to be Retained

### Amount to be Released

Here the shoe is on the other foot. With its remarkable elasticity the law now presumes that Cal Dive will prevail and Stena will lose on appeal. What does it take to secure Cal Dive's collection of its provable amount of loss? Ordinarily on an *in rem* appeal this would be recoverable under the usual Stipulation to Abide Decree (bond) which was not filed so that the *res* consists of the funds (with accumulated earnings arising from the deposit in interest bearing accounts) in the Registry. What and all Cal Dive is entitled to is security for the satisfaction of its proved damages if Cal Dive were successful on appeal. At the same time this unavoidably fixes the amount to be released to Stena as being unnecessary to protect Cal Dive.[5]

With this general explanation we can now proceed the Court's reasons for fixing the non-cost amount of the supersedeas bond (n. 1(c)) Cal Dive must give.

### (c) Earnings on Withheld Funds

The most important is the amount required to secure Stena against loss because of its inability to use the amount be retained in the Registry (fixed at $2,000,000, n. 1(e)).

As F.R.Civ.P. 62(d)[6] does not precisely define the amount and condition of the supersedeas bond, courts and commentators all agree that former Civil Rule 73(d) should be followed. *Poplar Grove, et al. v. Bache Halsey Stuart, Inc.*, 600 F.2d 1189, 1191 (5th Cir.1979).[7] Rule 73(d) provided that when the judgment (December 27, 1989) determines "the disposition of ... property ... in custody of the Marshal ... or ... such property ... is in the custody of the court...." the amount of the supersedeas bond shall be fixed "at such sum only as will secure the amount recovered for the use ... and detention of the property" plus costs and costs on the appeal and

---

5. For Example:

| | |
|---|---|
| Amount in Registry: | $3,000,000 |
| Amount to be Retained: | $2,000,000 |
| Amount to be Released | $1,000,000 |

6. F.R.Civ.P. 62(d) states:

   *Stay upon appeal.* When an appeal is taken the appellant by giving a supersedeas bond may obtain a stay subject to the exceptions contained in subdivision (a) of this rule. The bond may be given at or after the time of filing the notice of appeal or of procuring the order allowing the appeal, as the case may be. The stay is effective when the supersedeas bond is approved by the court.

7. Binding on the Eleventh Circuit, *Bonner v. City of Pritchard, Alabama*, 661 F.2d 1206 (11th Cir.1981).

"interest and damages for delay." [8]  *See* 9 Moore's Federal Practice § 208.05:

> Although former Civil Rule 73(d) was abrogated, the practice that it seemed to ordain was grounded in the very nature of a supersedeas bond, and it should continue to be followed.

*See* 7 Moore's Federal Practice § 62.06:

> Prior to the adoption of the Federal Rules of Appellate Procedure in 1968, the amount and conditions of the supersedeas bond were governed by former Rule 73(d) in the case of appeals to the court of appeals, or by the Supreme Court Rules in the case of direct appeals to that court. Former Rule 73 was abrogated at the time of the adoption of the Appellate Rules, but its subject matter was not picked in either the Civil Rules nor the Appellate Rules. The subject is sometimes covered by local rules, and in any event since former Rule 73(d) was a codification of the general underlying practice, its abrogation was not intended to effect any change in the practice.

(footnotes omitted.)

Interest causes no problem. It may be readily computed at 8%, the approximate rate earned on the deposited Registry funds. But this would not be full security if the party (Stena) would in all probability have earned more on such withheld funds. Here Stena fixes that at 12%, being the difference between the 8% now earned on Registry funds and 20% which the affidavit

of Svante Carlsson, Stena's chief financial officer, swears is Stena's demonstrated earnings on its investments. Cal Dive urgently contests the affidavit figure (20%), and acceptance of the affidavit at face value. But Cal Dive has not filed any controverting evidence and has urged only factually unfounded arguments (such as earnings by Stena from foreign exchange, profits, etc.) to challenge it.[9] Considering Stena's advocacy of the Carlsson affidavit as early as February 15, 1990, Cal Dive's total failure to present controverting evidence, the earlier unopposed Carlsson affidavit remains unopposed, uncontradicted. Accepting the unopposed affidavit, the Court fixes the rate at 20%.

This leaves then only the question of time—time to complete the appeal in the Court of Appeals for the Eleventh Circuit. Necessarily this is a precisely unprovable factor, so the Court must make a decision in the light of arguments of counsel, pro and con, on which to use its best judgment. Diligent and expeditious as is the Eleventh Circuit, it seems likely the appeal will take a minimum of two years, counting from December 27, 1989.[10]

### (e) Amount to be Retained in the Registry

Fixing this amount inevitably calls on the Court to use its best judgment on the mate-

---

**8.** Former Civil Rule Rule 73(d) provides:

SUPERSEDEAS BOND. Whenever an appellant entitled thereto desires stay on appeal, he may present to the court for its approval a supersedeas bond which shall have surety or sureties as the court requires. The bond shall be conditioned for the satisfaction of the judgment in full together with costs, interest, and damages for delay, if for any reason the appeal is dismissed or if the judgment is affirmed, and to satisfy in full such modification of the judgment and such costs, interest, and damages as the appellate court may adjudge and award. When the judgment is for the recovery of money not otherwise secured, the amount of the bond shall be fixed at such sum as will cover the whole amount of the judgment remaining unsatisfied, costs on the appeal, interest, and damages for delay, unless the court after notice and hearing and for good cause shown fixes a different amount or orders security other than the bond. When the judgment determines the disposition of

the property in controversy as in real actions, replevin, and actions to foreclosure mortgages or when such property is in the custody of the marshal or when the proceeds of such property or a bond for its value is in the custody or control of the court, the amount of the supersedeas bond shall be fixed at such sum only as will secure the amount recovered for the use and detention of the property, the costs of the action, costs on appeal, interest and damages for delay. A separate supersedeas bond need not be given, unless otherwise ordered, when the appellant has already filed in the district court security including the event of appeal, except for the difference in amount, if any.

**9.** The effort to submit controverting evidence through Kim Erickson's affidavit is ineffectual since the Court rejected the proposed filing thereof as untimely. The reasons therefor are set forth in the Appendix to this opinion.

**10.** Hence, $\$2,000,000 \times 12\% \times 2 = \$480,000$ (*see* n. 1(c)).

rials before it. Here the problem is not what a judge, wholly unfamiliar with the case and depending wholly on allegations in the pleadings and liberal, boastful arguments of counsel, would fix. Here this is being presented to a court, the judge thereof who has heard actual extensive testimony and who has in its announced findings and conclusion considered the intrinsic dollar value of the provable claim, assuming Cal Dive's theory of maritime lien were completely successful.

This Court on completion of the extended trial stated from the bench in its findings of fact and conclusions that it was unable to carry out its hope to be able to make full findings and conclusions on all phases of the case so that in the event the Court of Appeals were to reverse the basic findings on the availability of a maritime lien, the Court of Appeals could reverse and render all of it for entry of a final judgment disposing of all issues, including damages.

Unfortunately this could not be done since the court:

> would not be able to accept without further inquiry and available proof on the sufficiency of the tracing that is reflected in.... Cal Dive [Exhibit 372] [Exhibits 38] A, B, C and D ... but [the Court has] sufficient doubt about an adequate tracing, within the law, for maritime lien for advances [exists] ... one of the factors that affects [the Court's] inability to accept in full [Exhibits 38 A, B, C, and D and 372] is the fact that there are a lot of items of which the Court would now hold there can be no maritime lien ... It would make a pretty good argument that this demonstrates that, at the time the money was paid out, no one had the slightest idea that it was to discharge a claim that would give rise to a

lien. They were just advancing the money. There were going to make a profit out of it, they thought. (findings page 60–62).

The Court emphasized the basic requirement for a maritime lien—service (advance) furnished at the request of an authorized person:

> these advances were not made on the order of the master or anybody on board the ship who had any authority to act for the ship. They were not made on the order of the charterer, MSM, or anybody for who [sic] could be acting in its behalf. The advances were made generally on ... because of a telex, help we need money, send money.... (findings page 59)

Refraining from Stena's colorful expression that Exhibit 38 "is littered with the wreckage of Cal Dive's ill-fated maritime lien claim," the Court concurs with Stena's contention. Exhibit 38A (Cal Dive Exhibit 372) reflects untraced advances, administrative expenses, executive salaries, apartment rentals, automobile rentals and the like for which under no presently existing maritime law there can possibly be a lien against a vessel miles away at sea. For example, as Stena points out, the document reflects:

| | |
|---|---|
| Total claim: | $1,733,522.28 |
| Advances made to Oceanica: | $1,061,000.00 |
| Maximum potential recovery: | $672,522.28 |

The advances made to Oceanica fails because expended for services not creating a maritime lien and because it has not adequately traced these advances to the vessel against which the lien is asserted.[11]

With this birdseye view, as viewed by a bird who was there, of the maximum likely damages Cal Dive could prove would amount with interest at 8% for 8 years [12] to

---

**11.** *See also* Exhibit 38(C) Oceanica expenses for Carmen Shore Base include such substantial items as auto rentals, photocopies, office supplies, telephone, office refreshments, repair and maintenance of office and office equipment, house rental and miscellaneous, adding up to $67,724.79.

*See also* Exhibit 38(D) Oceanica expenses for Mexico City office through June 1985, wages Mexico City office, auto rental, professional fees, telephones, other miscellaneous office

rental, rental of Sandro's apartment, maintenance and repair of office and office equipment and depreciation hotels, meals for staff, currency gain/loss, subscriptions and publications, making a grand total of $311,375.69.

**12.** Annual Interest

| | |
|---|---|
| on $672,522.28 is | $53,801.78 |
| 8 years beginning with 1985 (Ex 38A) to 1992 (2 years for appeal) | |
| 8 years × $53,801.78 = | $430,414.24 |

no more than $1,102,936.52.[13] The Court's fixing the amount to be retained in the Registry at $2,000,000.00 allows for more than enough for errors in calculations, prospective recovery and other items. This estimate does not take into account the percentage of likelihood of success by Cal Dive (e.g., 50%, 60%, etc.) but assumes, as the law requires, that it will be 100% successful.

In making the final determination of the amount Cal Dive can recover, necessarily the law requires this Court to assume that Cal Dive will prevail so that some advances or reimbursements would create maritime liens. But even on this assumption, considering all of the evidence heard in the three week trial by the Court, it is the Court's best but informed judgment that, including interest, the very outside estimate would be $2,000,000. Cal Dive thus faces the burden of demonstrating that on the total record, Cal Dive in fact would receive in excess of $2,000,000.[14]

■ It bears emphasis that there is and can be, no maritime lien for the land-based operation or expenditures presently involved in Cal Dive's claim.

> To give rise to a lien a claim must be in the first instance maritime ... There can be no maritime lien which does not involve a vessel, its cargo or freight ...

G. Gilmore & C. Black, *The Law of Admiralty*, § 9.20, p. 624 (2d ed. 1975). Persons making advances to pay for or reimburse other for services which would create a maritime lien must satisfy a strict burden of tracing the advances into a specific maritime lien purpose and which were authorized by a person having authority to create the lien. For example, "[o]wners (including part-owners and stockholders) are not entitled to a lien for advances, nor is the ... sort of agent who qualifies as a 'general agent'." *See id.*, 626 n. 89. Although modern law recognizes an assignment to one making the advance, the "... money had to be specifically advanced for the purpose and also had to be put to the designed use", *id.*, p. 634, n. 109. The requirement is very strict, *see, e.g.,* "nor will an unrestricted advance of money to an owner to use as he sees fit entitle the person who makes the advance to a lien position with respect to claims which his money is in fact used to pay off." *Id.* p. 635.

### (f) Amount of Registry Funds to be Released

The amount to be released flows directly from the amount just fixed to be retained after deducting that from the current amount in the Registry.[15]

SO ORDERED.

### APPENDIX

■ As the text reflects, Cal Dive sought to create a factual controversy by proffering on July 6 the Kim Erickson affidavit for filing, the Clerk was instructed to mark as "received but not filed pending instructions from Judge Brown."

The Court, on Tuesday, July 10, 1990 rejected the filing of the Kim Erickson affidavit as untimely (it did likewise as to extended the judgment debtor as a price of interdicting the validity of an order to pay money.

---

**13.**

| Maximum recovery: | $672,522.28 |
| Interest 8 years: | $430,414.24 |
| Total | $1,102,936.52 |

**14.** Although speaking in terms of departure from usual full security supersedeas bond and not, as here, the amount of funds to be retained in the Registry the Court in *Poplar Grove, supra,* stated:

> [I]t should place the burden on the moving party to objectively demonstrate the reasons for such a departure. It is not the burden of the judgment creditor to initiate contrary proof. Such a supersedeas bond is a privilege

**15.**

| Amount in Registry as of July 2, 1990 | $3,879,301.58 |
| Amount to be Retained: | $2,000,000.00 |
| Amount to be Released (to be increased by earnings subsequent to July 2, 1990): | $1,879,301.58 |

the Stena proposed counter unnotarized affidavit of Svante Carlsson affidavit).

First, as a point of actual fact on untimeliness, this economic problem, at least since February 15, 1990 was directly in issue. Stena's "memorandum in support of its position to lift stay and for release of all funds from the Registry, etc." filed that day, discussed (p.4) the Svante Carlsson, Chief Financial Officer of Stena, affidavit, attached as Exhibit B. This fixed earnings on investments at 20%. No counter affidavit of any kind was proffered or sought to be proffered until Friday, July 6, 1990. Additionally, in setting the hearings June 13, 14 at Mobile, the Court made clear that all issues would be discussed and determined. At that hearing the Court expressly (see report of the proceeding) rejected as factually unsupported Cal Dive's arguments against acceptance of the Svante Carlsson 20% figure, and judicially determined that to be the probable amount of earnings Stena would make on the funds to be retained in the Registry ($2,000,000) and on which Stena would be denied the use pending appeal. Next, counsel acting for all transmitted by letter July 3, 1990 a proposed order as to (i) district court costs and (ii) fixing Cal Dive's supersedeas bond in which the figure $480,000 was, specifically stated. There was no indication that such figure was now to be challenged by some sort of new evidence. Finally, about noon Friday, July 6—about the same time the Court was faxing to the Clerk (for counsel) the proposed orders (i) and (ii) which it would enter on Wednesday, July 11 at noon and requesting of counsel comments, objections, exceptions, pro and con—came the belated fax proposal to file the Kim Erickson affidavit. Naturally, because of geographical distances between the Court (the Judge) and Mobile, Alabama the supporting document to the Erickson affidavit (Stena Line AB Annual Report 88–89) was not received until Monday, July 9.

In sum, this was a too-late, too-long-delayed effort to create a factual controversy.

Second, and demonstrating again the total untimeliness of this "new" evidence is the fact that had the Court permitted it to be filed it would necessarily open these pre-appeal proceedings for days, or weeks, or even months. For example, the Erickson affidavit asserts that the 20% rate should be rejected since inflation rate in Sweden (13.37%) in contrast to inflation rate in the United States (8.44%) was markedly different for a differential of 4.93%. Since the problem before the Court was not to fix damages but merely afford security for the probable amount of earnings which Stena would lose because of its inability to use the amount to be retained in the Registry ($2,000,000) (see Rule 62(d) and former Rule 73(d)). Just how or in what manner, if ever, this differential in inflation rate would create any fiscal problem is beyond the ken of this Court. The Court acknowledges, without apology, its state of total, uninformed, ignorance in the mysteries of economic theory. Stena's interdicted opportunity for investment does not require investment in the United States. It may invest with reasonable safety wherever the most likely return would be obtained. As Swedish interests, Sweden is Stena's choice. Nothing in Rule 62(d) (73(d)) requires the Court to require investment in the most inflation free nation.

In this situation the Court could in assaying the Erickson affidavit either (i) rely on its uninformed judgment or (ii) set the matter for further hearing. At this late stage the Court chose not to risk the course of relying on its own uninformed judgment by denying the filing of the proposed affidavit. The alternative course presaged the further, and likely extensive, counter-counter-economic evidence. More likely, it presaged the prospect of lengthy evidentiary hearings of witnesses, pro and con, principally highly trained and highly paid economic experts. All of this—including the choice of courses—could, and ought to have been, averted by Cal Dive countering in a timely fashion and in some acceptable way, factually challenging the Svante Carlsson 20%.

Friday, July 6, 1990 and Tuesday, July 10 was simply too late for the admissibility of

the Kim Erickson affidavit the filing of which the Court rejected.

Nevertheless, the Court is instructing the Clerk to include in the record for the prospective mandamus proceeding copies of the Kim Erickson affidavit and the Stena Line AB Annual Report attached and the proposed unnotarized counter-affidavit of Svante Carlsson. Appropriate exceptions are allowed to each.